## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN MOORE, | CIVIL ACTION |
| Plaintiff, | NO. _____ |
| v. | |
| CITY OF PHILADELPHIA, and DETECTIVE WILLIAM COOGAN, DETECTIVE WILLIAM GROSS, DETECTIVE ROSSITER, DETECTIVE RALEIGH WITCHER, and DETECTIVE JOE WALSH, in their individual capacities, | **COMPLAINT** |
| Defendants. | |

Plaintiff, John Moore, by and through his attorneys, the Marrone Law Firm, LLC, hereby alleges as follows:

### INTRODUCTION

1.      In July of 2023, after spending virtually his entire adult life in prison, plaintiff John "Yahya" Moore was released from incarceration after having served almost 27 years in state prison for a crime he did not commit.  The only evidence in support of Defendant City of Philadelphia's murder charge against Mr. Moore was the testimony of James Lamb.  Lamb has now recanted and confirmed that the lies he told at trial were coerced by the Philadelphia Police Department ("PPD").  Lamb had turned himself in approximately one month after a July 7, 1996, robbery-homicide that resulted in Sammy Cedano being shot to death and William Cintron and Daniel Diaz being wounded.  The two surviving victims and Domonique Maxwell, a bystander eyewitness, all identified Lamb as the shooter, but also confirmed that Lamb had a co-conspirator.  Despite none of those individuals ever implicating Mr. Moore as the other robber, James Lamb testified at trial that it was Mr. Moore.  Lamb received a reduced sentence in

exchange for his testimony.  Mr. Moore was found guilty and sentenced to life in prison without the possibility of parole.

2.          Nearly thirty years later, the real story is now known.  Lamb has recanted and confirmed that Defendant Detectives Raleigh Witcher and William Gross coerced a false statement from him.  This miscarriage of justice is compounded by the fact that the Defendants knew who the real co-conspirator was because Lamb told them.  It was Robert Turner, known only as "Newton" to Lamb.  Newton was known as a drug dealer in the neighborhood.  The PPD was able to confirm this by means of a police blotter that was deliberately withheld from Mr. Moore.  After spending almost a year searching for Newton, who had been on the run soon after committing the crime with Lamb in early July 1996, the police learned that approximately four months after the crime, Newton took his own life, making it impossible for him to be convicted for the robbery-homicide he had committed with Lamb.  For this reason, Lamb was told to identify someone else, someone that the PPD could convict.  That someone else was John Yahya Moore.

3.          The wrongful arrest and conviction of Mr. Moore was part of a pattern and practice of the City of Philadelphia, whereby detectives of the PPD Homicide Unit routinely resolved cases by using coerced statements and testimony, as well as fabricated and suppressed evidence.

4.          In 1996-1997, the Homicide Unit, and its detectives pursued this case and fabricated a basis for probable cause to arrest Mr. Moore one-and-a-half years after the murder.

5.          During all 26 years of his incarceration, Mr. Moore always maintained his actual innocence of the crimes committed on July 7, 1996.  He continued to amass the evidence

described above and additional evidence of police misconduct, as described more specifically below.

6.      In 2023, Mr. Moore was finally able to secure his release from prison, although not before being forced to endure the additional indignity of having to plead guilty to a lesser crime.  Even though he did not commit this crime, Mr. Moore knew that this would be his only opportunity to gain his freedom.  In connection with this negotiated resolution to Mr. Moore's criminal case, his original conviction was vacated, providing the "favorable outcome" required by *Heck v. Humphrey*, 512 U.S. 477 (1994).

7.      Mr. Moore now makes the within claims for violations of his rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.  He was arrested and convicted on the basis of false evidence, which was known by the Defendants herein to be false at the time it was used in the affidavit of probable cause to arrest and subsequently put before the court.  Mr. Moore's constitutionally protected right to due process was also violated by the deliberate suppression of exculpatory evidence, because if this evidence had not been withheld, Mr. Moore would never have been arrested, and obviously would never have been convicted at trial.  As a result of this conduct, Mr. Moore was forced to spend more than a quarter century in state prison.  He now seeks compensation for the wrongful arrest, wrongful conviction, and wrongful incarceration that robbed him of so much time.

## JURISDICTION AND VENUE

8.      This action is brought pursuant to 42 U.S. § 1983 to redress the deprivation under color of law of the Plaintiff's rights as secured by the United States Constitution.  This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

9.     This Court has supplemental jurisdiction over the plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

10.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

## JURY DEMAND

11.     Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

12.     Plaintiff **John Moore** is, and at all times relevant to this Complaint was, a resident of Pennsylvania.  Mr. Moore was born on July 22, 1973.  In May of 2000, Mr. Moore was wrongfully convicted of the murder of Sammy Cedano and the aggravated assault of William Cintron and Daniel Diaz and, as a result, served just under 27 years in jail and prison. Only when evidence of the Defendants' wrongful, illegal and unconstitutional conduct and Mr. Moore's innocence came to light years later was there a basis for his original charges, convictions and sentence to be vacated and he was able to be released from prison.

13.     Defendant **City of Philadelphia** is, and at all times relevant to this Complaint was, a municipality located in the State of Pennsylvania.  The City of Philadelphia was, at all times relevant to this Complaint, officially responsible for the policies, practices and customs of the Philadelphia Police Department ("PPD"), and was the employer of the individual PPD Defendants in this matter.

14.     Defendant **William Coogan, Badge No. 9086**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his

employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Coogan was assigned as a detective with the Homicide Unit at the time of this investigation.

15.     Defendant **William Gross, Badge No. 683**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Gross was assigned as a detective with the Homicide Unit at the time of this investigation.

16.     Defendant **Rossiter, Badge No. 9113**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Rossiter was assigned as a detective with the Homicide Unit at the time of this investigation.

17.     Defendant **Raleigh Witcher**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Witcher was assigned as a detective with the Homicide Unit at the time of this investigation.

18.     Defendant **Joe Walsh**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the

PPD. He is sued in his individual capacity. Upon information and belief, Walsh was assigned as a detective with the Homicide Unit at the time of this investigation.

19.     Defendants Coogan, Gross, Rossiter, Witcher and Walsh are collectively referred to herein as "Individual Defendants."

20.     At all times relevant to this Complaint, the individual Defendants named above acted in concert and in conspiracy with one another in order to deprive Mr. Moore of his constitutionally protected rights.

## FACTUAL ALLEGATIONS

### The July 7, 1996 Murder of Sammy Cedano

21.     On July 7, 1996, at approximately 12:10 a.m., Sammy Cedano, Danny Diaz and William Cintron were robbed outside a North Philadelphia Chinese Store on the corner of 9th and Somerset Streets in Philadelphia. Cedano and Cintron were shot in connection with the robbery, and Diaz was pistol whipped. While Diaz and Cintron survived their injuries, Cedano died from his.

22.     Diaz was interviewed that night at the police station by Detective Rossiter. He reported that he had just passed the Chinese store at 9th and Somerset, where he saw two black males standing in the doorway. Diaz's brother, Sammy Cedano and a friend, William Cintron, were walking behind him. As Diaz was waiting to cross the street, one of the individuals he had just passed came up behind him and put a revolver ("like a little revolver, a .32 snubnose") to the side of his head. Diaz described him as a young, light-skinned black male, 17-21 years old, 5'4", 120-130 pounds, with no facial hair, wearing a white shirt, white cap with another color in it, white sneakers and dark shorts. The assailant told him to walk back down 9th Street, and after walking less than half a block, told him to lay on the ground. As he laid on the sidewalk, the

assailant asked him if he had money.  After he told him "no," the assailant started going through his pockets and took $17-$20 from there as well as his beeper.  The assailant then hit him over the head with the pistol.  While hitting him with the gun, he took a gold chain and a gold ring off of him.  He told Diaz not to move and walked away back toward Somerset.

23.    While Diaz was being robbed, the other individual who had been standing outside the Chinese store grabbed Cedano and Cintron.  They too were forced to lay on the sidewalk. Diaz described the second perpetrator as 5'6"-5'7", 140-150 pounds, and as darker-skinned and a bit taller than the one who assaulted him, wearing a striped shirt.  He did not give an age description.

24.    After Diaz's assailant walked away from him, Diaz heard a gunshot.  He then heard one assailant yell "Don't kill them."  He then heard a second shot, and saw both assailants run up 9th Street towards Somerset.  Diaz then got up off the sidewalk and ran down 9th Street towards Lehigh Ave. and 8th Street.  Both Cedano and Cintron were still laying on the ground behind where Diaz had been.  He used a payphone to call 911.  A female police officer drove by and took him to the hospital, where he was treated for his bleeding and got stitches on both sides of his head.

25.    William Cintron was taken to the hospital from the scene of the crime because he had been shot in the back.  His first statement of record was taken by Detective Coogan at the police station on July 22, 1996.  Cintron told police that a little after midnight on July 7, 1996, he was walking in the neighborhood with his friends Cedano and Diaz when he went into the Chinese store to get some food.  Inside the store, two black males pulled guns on him and told him to give them his money.  He described one of the individuals as a light-skinned black male, 16-17 years old, between 5'3" to 5'5" tall, and about 135 pounds, wearing a baseball cap, and

brandishing a 22-caliber revolver. He described the second individual as a dark-skinned black male, 18-22 years old, 5'7"-5'8", 150 pounds, brown eyes, short hair, with a moustache, and brandishing a small gun. They marched him outside where Cedano and Diaz were and told him again that it was a "stick up." Then the dark-skinned individual began hitting him and Cedano with his gun, while the light-skinned male was hitting Diaz and Cintron with his gun. The dark-skinned man took $100 from Cintron, and then both assailants told the three men to lay on the ground. While Cedano and Diaz were already on the ground, Cintron pretended that he was going to lay down. Instead, he jumped up and grabbed the "short, light-skinned guy." As he jumped up, the dark-skinned male shot Cedano, who was on the ground. As Cintron jumped the light-skinned male, him, the light-skinned male shot Cintron in the back. Diaz ran away from the scene first, then Cintron and Cedano, running away from the store. As the three men were running away, the two assailants ran back towards the store and fired one or two shots at them. Cedano fell down after running about a half block.

26.    Cintron reported that he thought he had seen the males before, as he had relatives in the area. Detective Coogan showed Cintron an array of nine photos, and asked if he recognized anyone. He stated that a photo of Lamb looked like the light-skinned assailant, whom he thought "sounded and acted like a kid."

27.    Detectives Coogan and Gross re-interviewed Diaz at the police station on July 22, 1996. They showed him the same nine photos that they had just shown Cintron, and asked if he recognized anyone involved in the incident on July 7, 1996. Diaz stated that a photo of Lamb looked like the light-skinned individual who assaulted him, describing him as "the short guy," "young boy of 15 to 18 years" who hit him on the head with his gun.

28.     About one week later, on July 30, 1996, Detective Gross presented Cintron, and then Diaz, with an array of eight photos, and asked them if they recognized the dark-skinned assailant in any of the photos.  This array contained photos of Mr. Moore and of other black males with similar physical characteristics to Mr. Moore.  Cintron stated that he could not be sure without seeing the assailant in person because he could then recognize him by his voice. Diaz stated that he only got a good look at the light-skinned assailant, and could not identify the dark-skinned assailant in any of the photos.

29.     Cedano had been shot in his upper left back.  When he was transported to the hospital, he was pronounced dead from a .380 automatic weapon.

30.     In the hours following the murder, police canvassed the neighborhood and were alerted to an eyewitness to the crime: an eleven-year-old girl named Domonique Maxwell. Domonique's mother Shirley told detectives that her daughter saw "the job go down" by two 16- or 17-year-old neighborhood drug dealers, whom her daughter recognized because they sold drugs in front of the Chinese store, which was across from the Maxwell home.

31.     About two weeks later, on July 24, 1996, Domonique and her mother went to the Homicide Unit and each gave a statement to police.  In her statement taken by Detectives Walsh and Coogan, Domonique stated that she had witnessed the crime from her doorway, where she observed two males standing at the street corner, each of whom had a gun, shooting at two men. She knew one shooter, whom she knew as "Shortie," because for about a year before the shooting, he had come into the schoolyard where she attended school and she would talk to him. She described him as light-skinned, short, with blondish hair and a facial scar.  She said that he was wearing a white shirt, white hat and white sneakers on the night of the shooting.  When she was shown a photo array of nine photos, she identified a photo of Lamb as "Shortie."  She also

recognized a photo of Asa Wabster in the photo array, whom she described as a tall and thin male who sold drugs near her house.

32.     Domonique told Detectives Walsh and Coogan that although she did not know the name of the second shooter, she recognized him because she had seen him about five times before.  She described him as dark-skinned, and taller, heavier and older than Shortie.  She said that on the night of the shooting, this second shooter was wearing a white shirt, jeans, a black cap and black sneakers.

33.     Less than one week later, on July 30, 1996, the police came to the Maxwells' home and showed Domonique another photo array.  This array contained photos of Mr. Moore and of other black males with similar physical characteristics to Mr. Moore.  Domonique stated that she did not recognize any of the males shown in the photos.

34.     Again at trial, Domonique testified that none of the pictures she saw were of the person she saw that night with Shortie.

**The July 22, 1996 Robbery**

35.     Meanwhile, early in the morning of July 22, 1996, police arrested Lamb and Mr. Moore for a different incident - a robbery committed against an individual named Thomas Thompson in the 1800 block of Glenwood Street in Philadelphia.  Lamb had been riding as a passenger in a vehicle driven by Mr. Moore.  At the time, Lamb was 15 years old and Mr. Moore was 23.  The two knew one another because Moore was dating Lamb's older sister, Lapricia Jessup.  While Lamb was asleep in the car, Mr. Moore committed the robbery.  A car chase by the police ensued.  Mr. Moore jumped out of the car and fled the scene.  The police woke up Lamb and recovered from his possession a .380 automatic, which he later told officers he had

used in the July 7, 1996 robbery.  A few minutes later, Lamb showed the police where Mr. Moore lived and the police arrested him for the Thompson robbery.  Mr. Moore and Lamb were taken to the police station.  Lamb was soon released into the custody of his mother, while Mr. Moore was held in police custody.

### The Police Link Lamb and His Gun to the Cedano Murder

36.    It was later that day (on July 22, 1996) that police showed Diaz and Cintron a photo array containing Lamb's photo, and two days later when they showed that photo array to Domonique.  All three of these eyewitnesses picked Lamb's photo as the light-skinned perpetrator on July 7, 1996.

37.    It was eight days later (July 30, 1996) that police showed Diaz, Cintron and Domonique a photo array containing Moore's photo.  Unlike when they were shown a photo of Lamb, these eyewitnesses stated that they did not recognize any of the males shown in the photos, and did not recognize the dark-skinned assailant in any of the photos.

38.    On August 10, 1996, Lamb was arrested for the July 7, 1996 murder of Cedano and other crimes committed against Diaz and Cintron.  On September 12, 1996, Mr. Lamb had his preliminary hearing.

39.    Soon thereafter, Mr. Moore pled guilty to the July 22, 1996 robbery, and was moved upstate while awaiting sentencing.

**Lamb's June 1997 False, Coerced Statement Implicating Mr. Moore**

40.     On June 9, 1997, when he was still 15 years old, Lamb gave a statement to Detectives Witcher and Gross describing his and Mr. Moore's alleged involvement in the July 7, 1996 incident.

41.     In the statement, Lamb states that after he and Mr. Moore spent the day and evening of the incident (July 6, 1996) taking codeine pills, smoking angel dust and drinking beer, late that night Mr. Moore urged them to walk from 13th and Somerset to 9th and Somerset to see who they could rob.  The statement says that while each of them was armed, they went into the Chinese store at 9th and Somerset and were "busting on each other."  Suddenly, Mr. Moore left the store, and when Lamb went outside to see where he went, he saw him pointing his gun at three men standing outside the store.  The statement says that Mr. Moore told the men to lay down on the ground, which they did, and then Mr. Moore got down on one knee and started to check the pockets of one of the men.  Mr. Moore called Lamb over and told him to check the pockets of the other men on the ground.  The statement says that after the man whose pockets Mr. Moore was checking looked up, Mr. Moore hit the man in the head with his gun.  Mr. Moore then supposedly smacked a second man in the head with his gun, and then stood up.  As Lamb began to go through the pockets of the second man who Mr. Moore had smacked, Lamb heard a shot go off.  Lamb jumped up, heard someone screaming and heard more shots.  Then Lamb heard Mr. Moore say "Shut up before I kill you all – I already got one body, what's another one?"  Lamb saw one of the three men start to get up, and he (Lamb) shot at him twice and hit him in the back.  Then Lamb ran away from the store towards his mom's house at 13th and Somerset, and Mr. Moore ran in the other direction.  Mr. Moore lived in an apartment above

Lamb's mother's house and he came home a little while later. At that time, Lamb asked him why he did the shooting, and Mr. Moore told him that he had to do it.

42.     Also according to his statement, two days after the July 7, 1996 incident, Lamb was driving a car in which Mr. Moore was the passenger, and they were planning to rob some people. Lamb had given Mr. Moore the gun that he had used in the July 7, 1996 incident to use in this robbery. While Mr. Moore committed the robbery, Lamb drove the car a short distance away to a nearby gas station. Then Mr. Moore ran to the driver's side of the car and told Lamb to move over into the passenger seat. Lamb put his gun under the passenger seat. The police then stopped the car. Mr. Moore ran away, but the police caught Lamb and took his gun. Lamb showed the police where Mr. Moore lived, the police locked them both up, and then let Lamb go.

### Mr. Moore's Arrest, Trial and Conviction for the July 7, 1996 Murder

43.     Four months after giving police this statement, on October 10, 1997, Lamb entered into an agreement with the prosecution, where he would plead guilty to third degree murder in exchange for testifying against Mr. Moore.

44.     On December 17, 1997, Detective Gross swore out an affidavit of probable cause for the arrest of Mr. Moore for Cedano's murder and for robbery, aggravated assault and other crimes in connection with the July 7, 1996 incident. The only basis for probable cause to arrest Mr. Moore for this crime was Lamb's June 9, 1997 statement. While the affidavit summarized the statements given by Diaz on July 7 and 22, 1996, by Cintron on July 22, 1996, and by Lamb on June 9, 1997, it is notable what statements and other evidence were *not* referenced in it. Specifically, the affidavit *omitted* the statements given by Diaz, Cintron and Domonique Maxwell on July 30, 1996, when all three eyewitnesses *excluded* Mr. Moore as having been

present at the incident.  On that date, Detective Gross had shown all three witnesses a photo array containing Moore's photo.  After viewing the photos, all three eyewitnesses stated that they did not recognize any of the males shown in the photos, including Mr. Moore.  The affidavit also omitted any reference to Domonique's July 24, 1996 statement.  Also notable is that the affidavit was sworn out more than six months after Lamb gave his statement inculpating Mr. Moore as his co-conspirator in the July 7, 1996 incident.  And Lamb's June 9, 1997 statement was taken almost one year after all of the eyewitness statements had been taken.

45.    On December 17, 1997, an arrest warrant was issued for Mr. Moore.  Soon thereafter, Mr. Moore was arrested and charged with the murder of Cedano, and with robbery, aggravated assault, possession of an instrument of crime, and criminal conspiracy.

46.    Mr. Moore's Preliminary Hearing on the felony murder charges was held on January 27, 1998.  There, Lamb testified against Mr. Moore.  For the most part, he testified consistent with his June 9, 1997 statement.  However, on cross-examination, there were several discrepancies.  He testified that another person named "Newton" was at the crime scene with them, that he lived in the neighborhood, but that he didn't know his last name.  He also testified that he (Lamb) was the one who told the complainants to lay down on the ground, not Mr. Moore.

47.    Mr. Moore's bench trial began on May 4, 2000.  Officers Trenwith, Bannon, Dones, and Silcox provided testimony about the crime scene investigation immediately after the incident, and Detective Green provided testimony about his investigation at the hospital where Diaz and Cintron were hospitalized.  Neither the officers nor the detective provided any evidence linking Mr. Moore to the crime.

48.     The prosecution theorized that Mr. Moore was the main shooter.  This theory had its problems from the outset as Mr. Lamb was found to be in possession of a .380 automatic gun, the same gun used to kill Cedano, in contravention of the Commonwealth's theory that Mr. Moore was the ringleader.

49.     Lamb testified in accordance with his June 9, 1997 statement in that he inculpated Mr. Moore as being the ring leader.  However, he also testified that Newton was in the store with Lamb and Mr. Moore, and that he and Newton stayed in the store for about ten or fifteen minutes after Mr. Moore left to go outside.  He testified that the same person who had been hit in the head was the same person who was later shot in the head.  He also testified that he did not hit anyone that night, in opposition to his June 9, 1997 statement, in which he said that he shot one of the victims in their back.

50.     Domonique Maxwell, Diaz and Cintron testified consistent with their statements, where each of them continued to assert that Mr. Moore was *not* the dark-skinned perpetrator that they saw that night with Lamb.

51.     No forensic evidence connected Mr. Moore to the crime.  The only evidence connecting Mr. Moore to the crime was the testimony of Lamb.

52.     Judge Geroff found Mr. Moore guilty of second-degree murder, robbery, aggravated assault, possession of an instrument of crime, and criminal conspiracy.  He was sentenced to life without parole.

53.     After testifying against Mr. Moore on behalf of the Commonwealth, Lamb was sentenced to only five to twenty years of incarceration for his role in the July 7, 1996 shooting and robberies.  He served seven years before being granted parole.

**Mr. Moore Gets His "H" and DAO Files Containing Fabricated and Exculpatory Evidence**

54.    In April of 2021, after advocating for his innocence during all 26 years of his incarceration, and after filing many PCRA petitions, Mr. Moore was finally able to obtain the "H" file and DAO file on his case.

55.    From the inception of the investigation into Lamb's co-conspirator in the July 7, 1996 incident all the way through the prosecution of Mr. Moore, *all* of the evidence - except for Lamb's compromised testimony - pointed toward a man named Robert Turner – not John Moore -- as Lamb's co-conspirator.  Known only as "Newton" to Mr. Moore, Lamb, and others, Moore only learned the identity of the actual perpetrator of the crime years after his conviction after he received the "H" file and DAO file.  But the police investigating this case identified Turner months before they coerced Lamb into naming Mr. Moore as his co-conspirator, as evidenced by the following:

56.    Based on Domonique's description of Lamb and his co-conspirator as neighborhood drug dealers, the police downloaded a Narcotics Arrest Blotter that listed persons arrested for narcotics offenses in the area surrounding the Chinese store where the murder took place.  The list contained the age, race, gender, address, and PP number of each person listed.  Breaking down the list based on age and gender and having been arrested in the year prior to July 1996, only two people fit the physical descriptions given by witnesses Domonique, Diaz, and Cintron, one of whom was Robert Turner.  The blotter revealed that just one month before the murder, Turner was arrested on June 4, 1996 for the knowing and intentional possession of 420 mg of heroin just steps from the Chinese store.  The police, however, suppressed this document, and withheld it from the prosecution and from Mr. Moore.

57.     Using the information in this narcotics blotter, the police located an arrest photo of Turner dated June 4, 1996, the same date of the arrest listed in the suppressed narcotics arrest blotter.  The arrest photo is accompanied by a physical description of the subject that fits the description that the three witnesses gave for the second perpetrator.  Specifically, the photo shows that he was 5'8" tall, weighed 175 pounds, and had a darker complexion than that of Lamb. This description matches the descriptions of the second perpetrator given by Domonique ("darker-skinned older than [Lamb], and taller than [Lamb]"; Cintron ("taller, dark skinned Black male approximately 5'8"), and Danny Diaz ("a little taller [than Lamb], 5'6"-5'7").  These witnesses all readily identified Lamb, but not Mr. Moore.  A photograph of Robert Turner should have been shown to them by the police; it could not have been shown by the defense, however, because the police suppressed this critical evidence of the suspect who they strongly believed was Lamb's co-conspirator.

58.     Additionally, the name and address of Robert Turner would have led reasonably competent trial counsel to his home where the following information could have been learned from his mother and sister:

a.   Robert Turner was known as Newton by his family and friends.  This was a nickname given to him by his mother when he was very young, and outside of the classroom he was only ever known as Newton.

b.   Robert Turner was "very close" friends with Lamb.  In fact, Lamb "looked up to Newtin and loved him.  They spent a lot of time together" and Lamb was at Turner's house "a lot."

c.   Robert Turner had a reputation for committing armed robberies, which his sister believes led to his being shot twice.

d.   Robert Turner died in October 1996, thus making it impossible for Lamb to secure a plea deal in exchange for testimony against his actual co-perpetrator, since he was dead.

**Lamb's Recantation**

59.     In 2004, Lamb signed an affidavit in which he swears that he lied when he

testified that Mr. Moore was with him when he committed the robbery on July 7, 1996.  In the

affidavit, Lamb states that while he was being interviewed by Detectives Witcher and Gross in

June 1997, he told them that a friend named "Newton" who he used to hang out with in his

neighborhood was with him during the commission of this crime.  But the detectives "kept

pointing to a picture of John [Moore] saying 'what about him?'"  Then the police told Lamb that

if he "didn't say it was John than they were going to make sure that I go on death row."  It was at

that point that he "lied and said John was there."  Lamb goes on to explain what actually

occurred at around midnight on the night of the robbery:

> Me and my friend Newton went down 9th Street to rob somebody.
> When we got to the Chinese store we saw John and we started
> cracking jokes on him and then he left when he got his food.  After
> John left, a couple of minutes later I went outside and Newton was
> robbing the dudes.  That's when I helped him.  John wasn't there,
> he had been left.

60.     Because the police did not disclose the arrest photo and narcotics blotter

pertaining to Newton's true identity as Turner, Mr. Moore did not understand the motive of the

police for coercing Lamb to implicate Mr. Moore, whom they knew was not the actual

perpetrator.  It turns out that Newton was on the run soon after committing the crime with Lamb,

preventing the police from being able to immediately locate him.  Ultimately, it took police

almost a year after identifying Newton as Turner for them to learn that Newton was deceased and

that he had died back in October of 1996.

61.     Once the police realized that Newton was deceased, they decided they wanted to implicate a living co-conspirator.  That way, they could arrest and convict two people for the crime, instead of laying it all on Lamb, who was just a juvenile.

62.      The detectives investigating the July 7, 1996 incident should have ruled out Mr. Moore as having anything to do with the crime back on July 30, 1996, when the three eyewitnesses to the shooting *excluded* Mr. Moore as having been present at the incident.  But instead, almost one year after it was clear to police that Mr. Moore was not involved in the crime, the police decided to zero in on Mr. Moore as the suspected second perpetrator.

63.     Mr. Moore was a desirable target for the police to frame as being Lamb's co-conspirator.  He was stuck in prison serving a sentence for the robbery he committed on July 22, 1996, and they knew that he would be unlikely to testify at trial with his felony conviction.  And Lamb and Mr. Moore appeared to have a history of engaging in criminal activity together because police found Lamb in the passenger seat of the Mr. Moore's getaway car as he was driving away from the July 22, 1996 robbery he had committed.

64.     Moreover, the police knew that Lamb was easily susceptible to coercion because he was a juvenile of only 15 years old, and research shows that juveniles are more susceptible to coercive interrogation tactics than adults.  Consequently, the police coerced Lamb to sign a statement and to testify that Mr. Moore was his co-conspirator in and the ringleader of crimes committed on July 7, 1996.

65.     This motive to pin the crime on a living perpetrator explains why police continued to zero in on Mr. Moore as the suspected second perpetrator, despite their knowledge that he was not the actual perpetrator.

66.    The veracity of Lamb's recantation of his inculpation of Mr. Moore as his co-conspirator in the murder is corroborated by several individuals, both before and after he recanted.

67.    In 2005, Omar Moore stated that on July 8, 1996, Lamb told him that he and Newton had "shot some dudes" the night before.

68.    In 2006, Brian Scott signed an affidavit that prior to Mr. Moore's trial he was incarcerated with Lamb and that Lamb stated he was going to "lie on Jizz and get a deal."  Mr. Scott said that he did not know at the time that "Jizz" was John Moore until about three weeks before authoring his statement.

69.    In December 2021, a new witness, Robert Hunter, came forward and for the first time disclosed that he was present and witnessed the shooting that led to the death of Cedano. Mr. Moore had reached out to Hunter in an attempt to find some further information that could help him identify the individual they both knew as Newton.  In an interview with the DAO on December 21, 2021, Hunter stated that at the time of the July 7, 1996 incident, he was across the street and behind a car.  He told the assistant District Attorneys that he saw Lamb and an individual named "Newton" shooting their weapons at two individuals.  Hunter stated that Mr. Moore was not in the immediate area of the shooting at that time.  He said that Newton was the first of his friends to carry a gun, and that he would kill anyone that told on him.  He stated that around the time of the shooting, Newton was smoking PCP and "losing his mind."  Hunter told Mr. Moore's PCRA counsel that he did not come forward sooner because he did not want to be involved and he believed that Lamb would step up and "make things right."  When he learned that Lamb had not been able to make things right for Mr. Moore, Hunter decided to come forward.

70.     Lamb's recantation was consistent with a witness statement given *before* his recantation as well.  On January 11, 2000, Herman Brooks signed an affidavit stating that Lamb told him that he had been incarcerated for "the body that Newton did on 9th Street."

71.     The police withheld additional exculpatory evidence from Mr. Moore.  This includes:

    a.  The ballistics evidence proving that a gun belonging to Mr. Moore was not a match for the one used in this case;

    b.  A fruitless police search of Mr. Moore's home for property stolen from the victims in this case; and

    c.  The fact that the eyewitnesses to the crime not only failed to identify Mr. Moore in a photo array but also did not identify any of the other people whose pictures were shown to them whose physical features were similar to those of Mr. Moore.

### Mr. Moore's Release from Prison

72.     On April 20, 2022, Mr. Moore filed an amended PCRA Petition based on the additional evidence of police and prosecutorial misconduct that was uncovered in those files.

73.     In response to Mr. Moore's PCRA petition, the Commonwealth conceded that there was a contested issue of material fact regarding whether the police and prosecution withheld material evidence pointing to Newton as an alternate suspect when the police suppressed the "Narcotics Arrest Blotter."  It also conceded that there was a contested issue of material fact regarding the new witness Hunter's observations that Newton, and not Mr. Moore, committed the crime.  On that basis, it agreed to an evidentiary hearing on those claims.

74.     On June 27, 2023, Judge Scott DiClaudio of the Philadelphia Court of Common Pleas granted Mr. Moore's PCRA petition, vacated his conviction for second-degree murder and the other felony convictions, vacated his sentence to life imprisonment, and ordered a new trial.

75.     Even though Mr. Moore still maintains his innocence, he accepted a plea deal offered by the Commonwealth where it would recommend vacating his original second-degree murder conviction in exchange for a plea to a lesser charge of murder in the third degree, as well as to recommend a total sentence of 13 to 26 years, plus five years probation, which would amount to a sentence of time served.

76.     On July 10, 2023, Judge DiClaudio accepted the plea agreement and Mr. Moore's guilty plea to third-degree murder.  He sentenced Mr. Moore to 13 to 26 years of incarceration plus five years of probation.  The court ordered that he would receive credit for having served from July 22, 1996 through July 10, 2023.  Because Mr. Moore had spent twelve days short of 27 years in prison, Judge DiClaudio stated that he had served the full term of this new sentence and that he was to be discharged from custody immediately.

77.     The next day, on July 11, 2023, the court granted Mr. Moore's motion for credit for time served.  That same day, Mr. Moore was released from prison and finally a free man.

### Policies and Practices in the City of Philadelphia

78.     The Philadelphia Police Department's pattern and practice of unconstitutional misconduct in homicide investigations, including the suggestion of false statements from witnesses, and the suppression of exculpatory and inconsistent evidence, dates back to at least the 1970's and continued beyond the timeframe that the individual Defendants investigated and prosecuted Mr. Moore.

79.     From at least the 1970's, and continuing well beyond the timeframe that the individual Defendants investigated and prosecuted Mr. Moore, the City of Philadelphia had in force and effect policies, practices, and customs of unconstitutional misconduct in homicide

investigations, including but not limited to using coercive techniques in interviews to obtain false and misleading statements from witnesses, fabricating inculpatory statements from witnesses and evidence, coercing and suggesting false identifications of suspects through the use of unconstitutional identification procedures, withholding exculpatory and inconsistent evidence, ignoring eyewitness interviews, and fabricating incriminating statements from witnesses by feeding details about the crime to the witnesses.

80.     At the time of the investigation and prosecution of Mr. Moore, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to make false statements by witnesses appear true and reliable, including but not limited to: providing a witness with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication; taking misleading investigative steps to make statements appear more credible; selectively documenting witness statements and not the preceding interrogation, interview, preparation, or rehearsal; selectively recording witness interviews; and misrepresenting that a suspect's formal statement was a verbatim statement in the suspect's own words, even when paraphrased or altered.

81.     At the time of the investigation and prosecution of Mr. Moore, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to coerce false statements, including but not limited to: subjecting witnesses to needlessly prolonged interrogations and interviews; isolation; making promises, regardless of their truthfulness; threatening charges for unrelated misconduct; offering assistance in unrelated criminal matters, including pending or recently dismissed criminal charges; interviewing witnesses while they are under the influence of mind-altering narcotics that made them more susceptible to coercion and the drugs' mind-altering effects; and asserting that the witness will

benefit in some way from making a statement that assists the police, and suffer some sort of disadvantage if they do not assist.

82.    At the time of the investigation and prosecution of Mr. Moore, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to suppress or withhold exculpatory or inconsistent statements and evidence, in violation of their known duty under *Brady*, including but not limited to: making false statements to prosecutors about the existence of evidence; failing to provide complete homicide files to prosecutors; coercing witnesses into keeping exculpatory and inconsistent information from prosecutors; refusing to testify at trial; discarding or deleting exculpatory and inconsistent information from homicide files; ignoring exculpatory and inconsistent information so that there is no record to be deleted from homicide files; farming out portions of Homicide investigations to police officers outside the Homicide Unit or other detectives assigned to the Homicide Unit so as to maintain a lack of evidence of their participation; and threatening witnesses in possession of exculpatory and inconsistent information to prevent them from coming forward to prosecutors or testifying.

83.    Furthermore, at the time of the investigation and prosecution of Mr. Moore, the Philadelphia District Attorney's office had a policy, practice, or custom of withholding exculpatory or inconsistent statements and evidence, in violation of their known duty under *Brady*, including but not limited to: making false statements about the existence of evidence; allowing witnesses to provide false testimony; discarding or deleting exculpatory and inconsistent information from their files; ignoring exculpatory and inconsistent information so that there is no record to be deleted from their files.

84.    At the time of the investigation and prosecution of Mr. Moore's case, the Philadelphia Police Department had a policy, practice, or custom of detaining, arresting,

24

threatening, and interrogating purported witnesses in criminal investigations without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions, or for material benefits.  These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel.

85.    At the time of the investigation and prosecution of Mr. Moore's case, the Philadelphia Police Department had a policy, practice, or custom of maintaining a deliberately biased Internal Affairs Division that exonerated police officers and detectives, including Homicide Detectives, regardless of the evidence of misconduct.

86.    At the time of the investigation and prosecution of Mr. Moore's case, the Philadelphia Police Department had a policy, practice, or custom involving the intentional use of untruthful affidavits of probable cause to support arrest warrants that, in violation of their constitutional duties, failed to recite the totality of circumstances, including exculpatory information, and cited fabricated evidence, statements from coerced witnesses, omitted mention of credible exculpatory witness statements, and mischaracterized the nature of unconstitutional identifications.  The City of Philadelphia failed to train and supervise its officers and detectives to deter or end this policy, practice, and custom.

87.    These practices are well-known to the City of Philadelphia and its policymakers with respect to criminal investigations and prosecutions as a result of newspaper investigations, including the Philadelphia Inquirer's Pulitzer Prize winning reporting in 1977-78, governmental investigations, including the Philadelphia Police Department's 39th District Corruption Scandal in the 1990's, complaints from the public, complaints from attorneys, complaints from whistleblowers, prior litigation, including employment complaints to the EEOC, and internal police investigations.

88.     The Philadelphia Police Department was deliberately indifferent to officers' misconduct, and credible complaints to the Police Department's internal compliance department were disregarded.

89.     Various cases involving the exoneration of individuals accused of murder, individuals yet to be exonerated, and individuals who were in fact guilty demonstrate that this misconduct was pervasive within the City of Philadelphia in both the Police Department and District Attorney's office both before and after it investigated and prosecuted Mr. Moore, and, upon information and belief, the misconduct described in this Complaint was tacitly, if not expressly, permitted by, committed with, or deliberately ignored when committed in the presence of the Homicide Unit, Philadelphia Police Department, and/or District Attorney supervisors.

90.     Convictions that later resulted in exonerations demonstrate the rampant patterns, practices, and customs of official misconduct within the City of Philadelphia Police Department and a prior administration of its District Attorney's Office:

   a.   *Commonwealth v. Antonio Martinez* – This matter was investigated in 1985 and resulted in the exoneration of Mr. Martinez after more than 30 years of incarceration.  It was determined that during his 1990 trial the Philadelphia Police and District Attorney's withheld information in their files which were later determined to contain numerous pieces of evidence implicating another suspect in the murder, including an eyewitness who informed police that another individual committed the murders.

   b.   *Commonwealth v. Raymond Carter* – This matter, which was investigated from 1986 until his conviction in 1988, resulted in the exoneration of Mr. Carter after former police officer Thomas Ryan was indicted in February 1995 on federal corruption charges.  A Philadelphia judge ordered a new trial because the prosecution's star witness had been paid $500 by then-officer Ryan to testify against Carter.  The City of Philadelphia paid a "churchgoing grandmother" a significant settlement after she sued alleging Ryan helped frame her and send her to prison for 3 years.  In 1996, the Philadelphia Inquirer reported that Officer Jack Baird, who was Ryan's partner, fabricated evidence because Ryan wanted the overtime compensation often available to officers in murder investigations.

c.  *Commonwealth v. Messrs. Gilyard & Wells* – This matter, which was investigated in August 1995 and resulted in the exoneration of the defendants after periods of wrongful incarceration, involved the fabrication and coercion of witness statements, garnering of false identifications based on suggestive police behavior, the suppression of exculpatory evidence and the submission of untruthful affidavits of probable cause when seeking arrest warrants.

d.  *Commonwealth v. Donald Ray Adams* – Mr. Adams' case was investigated beginning in 1990 until his conviction in 1992.  Police ignored the physical description of the suspect provided by numerous eyewitnesses and instead opted to pressure and coerce an eyewitness with a crack cocaine addiction and criminal history.  Mr. Adams was eventually granted a new trial and a jury returned a verdict of not guilty in 2011.

e.  *Commonwealth v. Jimmy Dennis* – Mr. Dennis' case was investigated from 1991 until he was sentenced to death in 1992.  Nearly 25 years later, the United States Court of Appeals for the Third Circuit, sitting *en banc*, vacated Mr. Dennis' conviction, holding that constitutional violations by Philadelphia Police Department Homicide detectives had undermined the fairness of Mr. Dennis' trial.  Philadelphia Police Department Homicide detectives coerced witnesses, fabricated evidence, engaged in deliberate deception by concealing and suppressing material evidence, employed unlawful investigate techniques, presented false testimony, and denied Mr. Dennis due process of law and a fair trial.

f.  *Commonwealth v. Percy St. George* – Mr. St. George's case was investigated from 1993 until 1994.  A Philadelphia Police Department Homicide Detective obtained a statement from a man who signed another person's name because of his fugitive status.  As the trial approached, the Homicide Detective coerced the person whose named appeared in the signature to provide and sign a fabricated statement and to falsely identify Mr. St. George from an overly suggestive sham photo array.  Upon further investigation, evidence suggested the homicide detectives coerced the witnesses into providing false statements and false identifications.  The Detectives pleaded their Fifth Amendment right against self-incrimination rather than testify as to how they obtained the statements and identification.

g.  *Commonwealth v. Andrew Swainson* – In 1989, Andrew Swainson was convicted of murder on the statement of a single eyewitness, Paul Presley.  Presley was an original suspect arrested for the shooting moments after it occurred, covered in blood and running from the scene at 3:40 a.m.  The prosecution dropped charges against Presley three weeks later.  Det. Santiago soon took a statement from Presley.  Presley explained Det. Santiago's tactics: Presley had not seen Swainson at the time of the shooting, and only knew what he looked like because he'd been shown his picture by Det. Santiago.  Rather than showing Presley a real photo array, *all seven photos that Det. Santiago showed Presley were of Swainson*.

Presley explained that he only testified against Presley because he was coerced with threats of being charged for a separate drug crime. (Presley was charged under a different name, and the Commonwealth never disclosed the matter, *Commonwealth v. Kareem Miller*, DC No. 881855934; CP-51-CR-1024751, to Mr. Swainson.) Mr. Swainson was exonerated in 2020.

h. *Commonwealth v. Onyiah* – Following a 2010 homicide, now-convicted Detective James Pitts and Detective Ohmarr Jenkins used coercive means to fabricate evidence and obtain a false confession in a case where surveillance video confirmed that the confession was false and that Onyiah could not have committed the crime. That conviction was later overturned and formed the basis for Detective Pitts' criminal conviction.

i. *Commonwealth v. Jamaal Simmons* – In 2012, Jamaal Simmons was convicted for the 2009 murder of Rodney Barnes. That conviction was overturned based on Detective Philip Nordo having coerced two witnesses into making false statements.

j. *Commonwealth v. Frazier* – When 19-year-old James Frazier was brought into the Police Administrative Building by Nordo for questioning related to a homicide, Nordo threatened to sexually assault him if he did not sign a coerced and fabricated confession. After approximately seven years in prison, Frazier's conviction was overturned because of Nordo's conduct.

91. As a result of the pattern and practice of police misconduct that was in effect at the time of the investigation of the homicide for which Mr. Moore was charged, the United States District Court for the Eastern District of Pennsylvania entered a consent decree in the matter of *NAACP v. City of Philadelphia*, Civil Action No. 96-6045 (E.D. Pa. Sept. 4, 1996), requiring wide-ranging reforms in the Philadelphia Police Department and, in particular, providing for specific limitations on the investigative practices and policies of the within the City of Philadelphia Police Department.

92. During the 1980's and 1990's, and concurrent with the time of the investigation of this case by the Philadelphia Police Department, there was within the Department a pattern, practice and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments. On three separate

occasions in the 1980's, the United States District Court of Eastern District of Pennsylvania

issued orders enjoining the Philadelphia Police Department from engaging in these practices:

    a.  *Cliett v. City of Philadelphia* (1985): consent decree arising out of "Operation Cold Turkey," which resulted in the unlawful arrest and detention of 1500 individuals in drug sweeps;

    b.  *Spring Garden Neighbors v. City of Philadelphia* (1985): enjoining police sweeps of Latinos in the Spring Garden neighborhood as a part of a Homicide Unit investigation; and

    c.  *Arrington v. City of Philadelphia* (1988): enjoining unconstitutional stops, detentions and searches of Black men during the "Center City Stalker" investigation.

93.    At the time of the investigation and prosecution of Mr. Moore, the Philadelphia

Police Department had a practice, policy, and/or custom of:

    a.  engaging in unlawful interrogations of witnesses, witness detentions and interrogations, planting of evidence, fabrication of witness and suspect statements, coercing false identifications through the use of unconstitutional identification procedures, coercing false confessions through the use of unconstitutional conduct and procedures, and failing to disclose exculpatory statements and evidence;

    b.  failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;

    c.  failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search, and arrest powers;

    d.  ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police interrogations, searches and arrests, coercion of witnesses and suspects, falsifying and fabricating evidence, coercion of false identifications through the use of constitutionally defective identification procedures, coercion of false confessions through the use of unconstitutional conduct and procedures, and suppression of exculpatory evidence; and

    e.  failing to properly sanction or discipline Philadelphia Police Department officers, who are aware of and conceal or aid and abet violations of constitutional rights of individuals by other Philadelphia Police Department officers, thereby causing and encouraging Philadelphia Police, including the individual Defendants in this case, to violate the rights of citizens such as Mr. Moore.

94. At the time of the investigation and prosecution of Mr. Moore, and for many years before and thereafter, the Philadelphia Police Department and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers. The Internal Affairs Division of the Philadelphia Police Department has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

 a. the Philadelphia Police Department's internal investigatory process was riddled with excessive and chronic delays in resolving disciplinary complaints;

 b. the Philadelphia Police Department lacked consistent, rational, and meaningful disciplinary and remedial actions;

 c. the Philadelphia Police Department failed to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

 d. the Philadelphia Police Department's internal investigatory process fell below the accepted standards and practices and was arbitrary and inconsistent;

 e. the Philadelphia Police Department's discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to their number of violations;

 f. the conduct of Internal Affairs' investigations demonstrated that the Philadelphia Police Department internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

 g. a global analysis of Internal Affairs' investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

 h. the Philadelphia Police Department lacked an effective early warning system to identify, track, and monitor "problem" officers; and

 i. Internal Affairs failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, and interviews that were conducted were below acceptable standards of police practices and failed to address key issues.

## DAMAGES

95.     The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Mr. Moore to be improperly arrested and subjected to the horrors of imprisonment, unfairly tried, wrongfully convicted and forced to serve almost 27 years in prison for a crime he did not commit.

96.     As a direct result of Defendants' conduct and omissions, Mr. Moore sustained injuries and damages, including loss of freedom for more than 26 years, loss of his youth, loss of his relationships with family members, pain and suffering, mental anguish, emotional distress, countless indignities, degradation, permanent loss of natural psychological development, loss of life's pleasures, and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, voting, travel, enjoyment, and freedom of speech and expression.

97.     As a direct result of Defendants' conduct and omissions, Mr. Moore sustained economic injuries and damages, including loss of income from the employment he maintained before his wrongful arrest and incarceration and the loss of career opportunities.

98.     As a direct result of Defendants' conduct and omissions, Mr. Moore sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

## COUNT I
### 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments
### (Against all Individual Defendants)

99.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

100.     The individual Defendants, acting with malice individually and in concert, and knowing that probable cause did not exist to prosecute Mr. Moore for the robbery that led to the murder of Sammy Cedano and injuries to William Cintron and Daniel Diaz, intentionally caused Mr. Moore to be arrested, charged, and prosecuted for those crimes, thereby violating Mr. Moore's clearly established right, under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of prosecution absent probable cause.

101.     The individual Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and prosecution without probable cause.

102.     The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Moore's clearly established constitutional rights.  No reasonable officer in 1996-2000 would have believed this conduct was lawful.

103.     Despite Mr. Moore's submission of extensive evidence of his innocence, the Commonwealth refused to recommend full exoneration of his conviction.  However, the Commonwealth did concede that there was a contested issue of material fact regarding whether the police and prosecution withheld material evidence pointing to Newton as an alternate suspect when the police suppressed the "Narcotics Arrest Blotter."  It also conceded that there was a contested issue of material fact regarding the new witness Hunter's observations that Newton,

and not Mr. Moore, committed the crime. On that basis, it agreed to an evidentiary hearing on

those claims. Because it recognized the injustice of Mr. Moore's conviction, the Commonwealth

offered a concession: a recommendation for the Court to *nolle prosse* his original second-degree

murder, robbery, conspiracy and possession of an instrument of crime charges in exchange for a

plea to a lesser charge of murder in the third degree. Even though the Commonwealth knew that

Mr. Moore was innocent of the crime, to avoid the risk of another corrupt trial that could result in

him remaining in prison for the rest of his life, Mr. Moore accepted the plea deal. On June 27,

2023, the Court vacated the conviction for second-degree murder and the other felony

convictions, and he was finally released from prison on July 11, 2023. Because the charge he

plead guilty to was not part of the original accusations brought by the Commonwealth 26 years

earlier, the prosecution of the original charges terminated in Mr. Moore's favor.

104.    The acts and omissions by the individual Defendants described in the preceding

paragraphs were the direct and proximate cause of Mr. Moore's injuries as these Defendants

knew, or should have known, that their conduct would result in the wrongful arrest, prosecution,

conviction, and incarceration of Mr. Moore.

## COUNT II
**42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation (Against All Individual Defendants)**

105.    The preceding paragraphs are incorporated by reference as though fully set forth

herein.

106.    The individual Defendants, acting individually and in concert, and within the

course and scope of their employment with the Philadelphia Police Department deprived Mr.

Moore of his clearly established constitutional right to due process of law and to a fair trial by

fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements, including without limitation the false statements of witnesses.

107.    The individual Defendants deprived Mr. Moore of his right to a fair trial by intentionally withholding, concealing and/or suppressing material exculpatory and impeachment evidence, including without limitation, withholding the Narcotics Arrest Blotter and other information concerning the identity of Newton, including his real name of Robert Turner, address, date of birth, photo and criminal history, and concealing that the police coerced Lamb to sign a false statement and to testify falsely against Mr. Moore.

108.    The individual Defendants deprived Mr. Moore of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to obtain complete witness statements and conduct a complete investigation.

109.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Moore's clearly established constitutional rights.  No reasonable officer in 1996-2000 would have believed this conduct was lawful.

110.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Moore's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Moore's wrongful arrest, prosecution, conviction, and incarceration.

### COUNT III
### 42 U.S.C. § 1983 Civil Rights Conspiracy
### (Against All Individual Defendants)

111.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

112.    The individual Defendants, acting within the course and scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Moore of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and his right to a fair trial.

113.    In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

    j.    Suggesting, coercing, and/or fabricating inculpatory evidence in the form of witness statements;

    k.    Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* and impeachment material during the pendency of the case;

    l.    Wrongfully prosecuting Mr. Moore while knowing that they lacked probable cause; and

    m.    Committing perjury during hearings and trials.

114.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Moore's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Moore's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT IV
### 42 U.S.C. § 1983 Failure to Intervene
### Against All Individual Defendants

115.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

116.    By their conduct and under color of state law, the individual Defendants, acting within the course and scope of their employment with the Philadelphia Police Department, had opportunities to intervene on behalf of Mr. Moore to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

117.    These Defendants' failures to intervene violated Mr. Moore's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable police officer in 1997-99 would have believed that failing to intervene to prevent these Defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, withholding material exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Moore to be arrested and prosecuted without probable cause and wrongfully convicted, were lawful acts.

118.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Moore's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Moore's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT V
### 42 U.S.C. § 1983 Municipal Liability Claim
### (Against Defendant City of Philadelphia)

119.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

120.    The City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Mr. Moore's wrongful arrest and conviction, and for many years preceding and following this investigation, a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations, including in particular the use of coercive techniques in interviews and interrogations to obtain confessions; the fabrication of inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory evidence.

121.    Final policymakers for the City of Philadelphia had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions; withholding exculpatory evidence; fabricating inculpatory evidence; and, particularly, fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime, and failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

122.    Mr. Moore's injuries and damages were further proximately caused by policies and practices on the part of policymakers with responsibility of administration of the District Attorney's office to allow the withholding of exculpatory and/or inconsistent evidence, allow witness to provide false testimony, and to pursue profoundly flawed investigations and prosecutions.

123.    The widespread practices described in the preceding paragraphs, of which the City of Philadelphia had actual or constructive notice, were allowed to flourish because the

Police Department and District Attorney's office declined to implement sufficient training and/or any legitimate mechanisms for oversight or punishment.

124.     Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Mr. Moore's arrest, prosecution, and conviction and over 26 years of incarceration, as well as all the other injuries and damages set forth above.

## COUNT VI
### Malicious Prosecution Under Pennsylvania State Law
### (Against All Individual Defendants)

125.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

126.     The individual Defendants initiated or continued proceedings against Mr. Moore, without probable cause, with malice or specific intent to injure.

127.     The proceedings ultimately terminated in Mr. Moore's favor when the Court *nolle prossed* his original charges and convictions for second-degree murder, robbery, conspiracy and possession of an instrument of crime in exchange for a plea to a lesser charge of conspiracy to commit murder in the third degree, which was not part of the original accusations brought by the Commonwealth 26 years earlier.

128.     As a result of this malicious prosecution, Mr. Moore sustained the injuries and damages set forth above.

## PUNITIVE DAMAGES

129.     The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

130.    The conduct of the individual Defendants was outrageous, malicious, wanton, willful, reckless, and intentionally designed to inflict harm upon Plaintiff.

131.    As a result of the acts of the Defendants alleged in the preceding paragraphs, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff requests the following relief:

n.    That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

o.    That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

p.    A declaratory judgment that the practices and policies complained of are unconstitutional;

q.    For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

r.    For such other and further relief as appears reasonable and just.

MARRONE LAW FIRM, LLC

By:____s/ Joseph M. Marrone____
        Joseph M. Marrone, Esquire
        PA Atty ID# 64920
        Attorney for Plaintiff
        200 South Broad Street, Suite 610
        Philadelphia, PA  19102
        (215) 732-6700
        jmarrone@marronelaw.com

        Date: June 27, 2025